IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

JAY STEWART MILLER,

          Petitioner,                 No. CIV S-00-0757 LKK GGH P

    vs.

CAL TERHUNE, et al.,

          Respondents.            FINDINGS AND RECOMMENDATIONS

_____/

I. Introduction

        Petitioner is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. Petitioner challenges his 1997 conviction for second degree murder and being an ex-felon in possession of a firearm. Petitioner is serving a sentence of 49 years to life.

        This action is proceeding on the second amended petition filed May 21, 2002, which raises two claims: 1) jury instruction error; and 2) ineffective assistance of counsel. On April 16, 2003, this court recommended that the petition be denied. On September 10, 2003, the Honorable Lawrence K. Karlton declined to adopt the findings and recommendations as to petitioner's ineffective assistance of counsel claim and remanded the matter for an evidentiary hearing. Judge Karlton adopted the findings and recommendations in all other respects.

1   On November 8, 2004, and November 23, 2004, an evidentiary hearing was held

2   in this matter.  After carefully considering the record, the court recommends that petitioner's

3   ineffective assistance of counsel claim be denied.

4   II.  Issues

5   It is important to correctly define the issues as petitioner presently seeks to expand

6   the claims presented in the Second Amended Petition filed May 21, 2002, pp 2-3.  In that petition,

7   the operative, counsel drafted petition, petitioner raised three theories of ineffective assistance of

8   trial counsel:

9   (1) counsel's failure to request a jury instruction that petitioner's imperfect self-

10   defense could be construed as *in*voluntary manslaughter; (2) counsel's failure to present a theory

11   of voluntary intoxication which would have negated malice and intent to kill, and to thereby

12   request an instruction on involuntary manslaughter based on voluntary intoxication; (3) a catchall

13   ineffective assistance claim based on failure to object to evidence and failure to ask for a correct

14   jury instruction based on the violent character of the victim.

15   Only the second claim survived after review of the Findings and

16   Recommendations.  See order of September 10, 2003 at p.2 framing the issue as failing to

17   investigate and present a "defense" based on voluntary intoxication.

18   But petitioner argues as well here that it would be unwarranted hairsplitting at this

19   juncture to not encompass the theory that presentation of evidence regarding voluntary

20   intoxication may have permitted the jury to acquit altogether.  Hairsplitting or not, the claims of

21   this petition as drafted by counsel recognized only the claims that an involuntary manslaughter

22   instruction should have been requested either as a component of an imperfect self defense theory,

23   or as some type of free standing instruction based on the a lack of malice/intent.  Second

24   Amended Petition at 3 at paragraphs 13 and 14.  Moreover, counsel's present day argument that

25   presentation of voluntary intoxication evidence, uncoupled with an involuntary manslaughter

26   instruction, may now be asserted rests on complete speculation.  If a legitimate voluntary

2

1     intoxication "defense," i.e., investigation and presentation of significant intoxication evidence

2     along with experts, had been submitted in the trial court, petitioner implicitly asks all to believe

3     that the *prosecution* would not have asked for a lesser involuntary manslaughter instruction.  No

4     evidence whatsoever was presented on the prosecutor's state of mind given the hypothetical

5     presentation of significant evidence of voluntary intoxication, and it would be sheer speculation to

6     find that the prosecutor would have gone for  murder or nothing in this reconstructed habeas

7     hypothetical.  Thus, the court understands the remaining unadjudicated claim as one based on

8     presentation of voluntary intoxication evidence *and* a requested involuntary manslaughter

9     instruction.

10          Finally, after evidentiary hearing, petitioner further added a claim, or more

11     precisely, a new theory: "In the alternative, it [the voluntary intoxication] would have supported a

12     fallback *voluntary* manslaughter verdict by explaining the apparent inconsistencies between

13     Miller's testimony regarding self defense and the objective facts."  Petitioner's Post-Hearing

14     Brief at 32 (emphasis added).  For the reasons expressed below, this theory has not been

15     exhausted.

16    III.  <u>Anti-Terrorism and Effective Death Penalty Act (AEDPA)</u>

17          The Antiterrorism and Effective Death Penalty Act (AEDPA) applies to this

18     petition for habeas corpus which was filed after the AEDPA became effective.  <u>Neelley v. Nagle,</u>

19     138 F.3d 917 (11th Cir.), citing <u>Lindh v. Murphy</u>, 521 U.S. 320, 117 S. Ct. 2059 (1997).  The

20     AEDPA "worked substantial changes to the law of habeas corpus," establishing more deferential

21     standards of review to be used by a federal habeas court in assessing a state court's adjudication

22     of a criminal defendant's claims of constitutional error.  <u>Moore v. Calderon</u>, 108 F.3d 261, 263

23     (9th Cir. 1997).

24          In <u>Williams (Terry) v. Taylor</u>, 529 U.S. 362, 120 S. Ct. 1495 (2000), the Supreme

25     Court defined the operative review standard set forth in § 2254(d).  Justice O'Connor's opinion

26     for Section II of the opinion constitutes the majority opinion of the court.  There is a dichotomy

between "contrary to" clearly established law as enunciated by the Supreme Court, and an

"unreasonable application of" that law. Id. at 1519. "Contrary to" clearly established law applies

to two situations:  (1) where the state court legal conclusion is opposite that of the Supreme

Court on a point of law, or (2) if the state court case is materially indistinguishable from a

Supreme Court case, i.e., on point factually, yet the legal result is opposite.

"Unreasonable application" of established law, on the other hand, applies to

mixed questions of law and fact, that is, the application of law to fact where there are no factually

on point Supreme Court cases which mandate the result for the precise factual scenario at issue.

Williams (Terry), 529 U.S. at 407-08, 120 S. Ct. at 1520-1521 (2000).  It is this prong of the

AEDPA standard of review which directs deference to be paid to state court decisions.  While the

deference is not blindly automatic, "the most important point is that an *unreasonable* application

of federal law is different from an incorrect application of law....[A] federal habeas court may not

issue the writ simply because that court concludes in its independent judgment that the relevant

state-court decision applied clearly established federal law erroneously or incorrectly.  Rather,

that application must also be unreasonable." Williams (Terry), 529 U.S. at 410-11, 120 S. Ct. at

1522 (emphasis in original).  The habeas corpus petitioner bears the burden of demonstrating the

objectively unreasonable nature of the state court decision in light of controlling Supreme Court

authority.  Woodford v. Viscotti, 537 U.S. 19, 123 S. Ct. 357 (2002).

The state courts need not have cited to federal authority, or even have indicated

awareness of federal authority in arriving at their decision.  Early v. Packer, 537 U.S. 3, 123 S.

Ct. 362 (2002).  Nevertheless, the state decision cannot be rejected unless the decision itself is

contrary to, or an unreasonable application of, established Supreme Court authority.  Id.  An

unreasonable error is one in excess of even a reviewing court's perception that "clear error" has

occurred.  Lockyer v. Andrade, 538 U.S. 63, 75-76, 123 S. Ct. 1166, 1175 (2003).  Moreover, the

established Supreme Court authority reviewed must be a pronouncement on constitutional

principles, or other controlling federal law, as opposed to a pronouncement of statutes or rules

1   binding only on federal courts.  Early v. Packer, 537 U.S. at 9, 123 S. Ct. at 366.

2          However, where the state courts have not addressed the constitutional issue in

3   dispute in any reasoned opinion, the federal court will independently review the record in

4   adjudication of that issue.  "Independent review of the record is not de novo review of the

5   constitutional issue, but rather, the only method by which we can determine whether a silent state

6   court decision is objectively unreasonable."  Himes v. Thompson, 336 F.3d 848, 853 (9th Cir.

7   2003).

8          No state court held a hearing and found facts with respect to petitioner's claim

9   that his counsel grossly failed to investigate voluntary intoxication and present an imperfect self

10  defense theory to the jury.  Therefore, the ordinary rule that state factual findings are presumed

11  correct and can only be overcome by clear and convincing evidence, see Lambert v. Blodgett,

12  393 F.3d 943, 972 (9th Cir. 2004), does not apply here.  Rather the court engages in de novo fact

13  finding.  Killian v. Poole, 282 F.3d 1204, 1207 (9th Cir. 2002).

14  IV.  Background

15          The opinion of the California Court of Appeal contains a factual summary.  After

16  independently reviewing the record, the court adopts this summary below.

17          The defendant and Steven Faddis were long time friends.  On
    September 25, 1996, the defendant hosted a gathering at his house,
18      celebrating Faddis' release from prison.  In attendance were
        Faddis, the defendant, and others.  Kassy Goold, Faddis' girlfriend
19      arrived around 4 p.m.  She and Faddis were in the process of
        breaking off their relationship.  Everyone was drinking.  Everyone
20      except Goold, Faddis, and the defendant left around 8 p.m.

21          Later that night, Goold and the defendant were in the livingroom
        discussing Goold's breakup with Faddis.  Goold told the defendant
22      she was breaking up with Faddis because her family, in particular
        her brother, disapproved of the relationship.  Faddis threatened to
23      kill Goold's brother.  He shoved Goold onto the couch with his
        finger, then grabbed her by the hair and slammed her through the
24      glass coffee table.  The defendant intervened.  During the
        defendant's trial testimony, he claimed Faddis punched him and
25      then left the premises through the front door.

26  \\\\\

5

> According to the defendant's testimony, he grabbed the rifle and some ammunition and followed Faddis out the front door. Although the defendant did not see or hear anyone other than Faddis outside, he believed Goold was outside because he saw something underneath the truck. In fact, Goold was hiding inside the house.
>
> The defendant walked down the steps of his porch and yelled at Faddis to get off his property. Faddis yelled and came towards him. The defendant fired a shot at Faddis' shoulder but missed. Faddis continued to walk toward the defendant and threatened him. The defendant then aimed at the left side of Faddis' chest and shot again. The defendant claimed he was only trying to disable Faddis, but was not trying to kill him. After shooting Faddis, the defendant called 911 and began administering CPR until medical personnel arrived.
>
> The defense theory was self-defense. Evidence was presented that Faddis was exceptionally muscular and violent and had a history of abusing women. His ex-wife testified he had given her broken ribs, a collapsed lung, and head injuries during the course of their relationship.

Answer, Exhibit B, pp. 2-3.

V. <u>Exhaustion</u>

Respondent argued that during the evidentiary hearing and in post-hearing briefing, petitioner raised a new ineffective assistance of counsel claim that is not exhausted. For the following reasons, the court agrees and finds the claim unexhausted, or in the alternative, unmeritorious.

As set forth earlier, petitioner now argues that he is claiming that counsel was ineffective for failing to investigate *all* of the potential defenses counsel could have raised based on his voluntary intoxication. In particular, petitioner argues that counsel could have presented evidence that petitioner's voluntary intoxication prevented him from harboring express malice and also supported a defense of imperfect self-defense, both which would have resulted in a *voluntary* manslaughter conviction.

The court will first discuss the fact that nowhere in the briefs before the California Supreme Court did petitioner urge that he should only have been convicted of voluntary

manslaughter, hence the claim is unexhausted, and then will discuss the fact that such a theory was unavailable to trial counsel at the time in any event.

A petitioner satisfies the exhaustion requirement by providing the highest state court with a full and fair opportunity to consider all claims before presenting them to the federal court.  Picard v. Connor, 404 U.S. 270, 276, 92 S. Ct. 509, 512 (1971).   Both the legal substance and the operative facts must be presented to the state courts.  O'Sullivan v. Boerckel, 526 U.S. 838, 842-845, 119 S. Ct. 1728 (1999).  However, the Supreme Court has " emphasized that mere similarity of claims is insufficient to exhaust."  Duncan v. Henry, 513 U.S. 364, 36 115 S. Ct. 887 (1995).  Here, the overriding claim is the same, ineffective assistance of counsel.  However, no one would make the assertion that simply describing a claim as such would exhaust all possible variants or theories underlying the general assertion.  Rather, the specific facts and legal theories of ineffectiveness must be described.  Here, assuming the facts would not differ for petitioner's assertions that voluntary intoxication made both an involuntary and voluntary manslaughter conviction possible, one cannot argue that the theories are similar – there are important distinctions between involuntary and voluntary manslaughter.

But even more to the point, and reaching the merits of the claim, counsel could not have been ineffective for not urging voluntary intoxication as a form of voluntary manslaughter because at the time of his conviction such was not legally possible.  The court repeats its explanation of California law on the subject of murder/voluntary manslaughter/involuntary manslaughter which appeared in the previous Findings and Recommendations with further supplementation.

Murder is the unlawful killing of a human being with malice aforethought.  People v. Blakeley, 23 Cal. 4th 82, 87, 96 Cal. Rptr. 2d 451, 454 (2000).  Malice may be either express or implied.  Id.  "It is express when the defendant manifests "a deliberate intention unlawfully to take away the life of a fellow creature.'"  Id., quoting Cal. Penal Code § 188.  It is implied "'when the killing results from an intentional act, the natural consequences of which are

Case 2:00-cv-00757-LKK-GGH   Document 87   Filed 11/02/06   Page 8 of 23

dangerous to life, which act was deliberately performed by a person who knows that his conduct

endangers the life of another and who acts with conscious disregard for life.'" Id., quoting

People v. Dellinger, 49 Cal. 3d 1212, 1215, 264 Cal. Rptr. 841 (1989).

"Manslaughter is 'the unlawful killing of a human being without malice.'" Id. at

88, 96 Cal. Rptr. at 454, quoting Cal. Penal Code § 192. "A defendant lacks malice and is guilty

of voluntary manslaughter in 'limited, explicitly defined circumstances: either when the

defendant acts in a sudden heat of quarrel or heat of passion (§ 192, subd. (a)), or when the

defendant kills in an unreasonable self-defense'– the unreasonable but good faith belief in having

to act in self-defense." Id. at 87-88, 96 Cal. Rptr.2d at 454.

Involuntary manslaughter occurs when the defendant kills the victim "in the

commission of an unlawful act, not amounting to felony; or in the commission of an unlawful act

which might produce death, in an unlawful manner, or without due caution and circumspection."

People v. Wells, 12 Cal. 4th 979, 988-989, 50 Cal. Rptr. 2d 699, 704-705 (1996). At the time of

petitioner's conviction, regardless of the manner that an act of involuntary manslaughter is

committed, the killing must be unintentional. People v. Dixon, 32 Cal. App. 4th 1547, 1556, 38

Cal. Rptr. 2d 859, 863 (1995). Unconsciousness caused by voluntary intoxication is available as

a partial defense to an offense requiring a specific intent. Therefore, voluntary intoxication could

not reduce murder to voluntary manslaughter, as both require an intent to kill at the time; but if

intoxication could negate that state of mind, the resulting crime would be, at most, involuntary

manslaughter. People v. Saille, 54 Cal. 3d 1103, 1116-1117, 2 Cal. Rptr. 2d 364, 372-373

(1991)[1]. See also People v. Ochoa, 19 Cal. 4th 353, 423-424, 79 Cal. Rptr. 2d 408, 451 (1998).

Thus, at the time petitioner committed his crime, the main difference between

involuntary and voluntary manslaughter was that involuntary manslaughter did not require an

---

[1] Under California law, petitioner may not prove that intoxication precluded mental capacity to form intent – only that he *actually* had not formed the required intent because of intoxication. People v. Steele, 27 Cal. 4th 1230, 1253, 120 Cal.Rptr. 2d 432, 450 (2002).

intent to kill, whereas voluntary manslaughter did.  This fact was recognized in People v. Blakeley, 23 Cal. 4th 82, 89, 96 Cal. Rptr. 2d 451, 455 (2000).  Thus, severe intoxication to the point of unconsciousness, which robs anyone of the intent required for murder or voluntary manslaughter, could not be used to argue voluntary manslaughter on any theory.

However, in Blakeley and the companion case to Blakeley, People v. Lasko, 23 Cal. 4th 101, 96 Cal. Rptr.2d 441 (2000), the state supreme court disavowed that well recognized distinction.  The California Supreme Court expanded the definition of voluntary manslaughter, holding that a person who unlawfully kills while having an unreasonable but good faith belief in the need to act in self-defense is also guilty of voluntary manslaughter, whether he or she intentionally killed, or, acting with conscious disregard for life and the knowledge that the conduct was life-endangering, *unintentionally* killed.  Blakeley, 23 Cal. 4th at 85, 96 Cal. Rptr. 2d at 453.  The Blakely court held that its decision did not apply to crimes committed before the opinion was issued on June 2, 2000, because the decision was "an unforeseeable judicial enlargement of the crime of voluntary manslaughter. . ." 23 Cal. 4th at 92, 96 Cal. Rptr. 2d at 458.  Petitioner's conviction became final November 23, 1999, when the California Supreme court denied his petition for review.  Respondent's Answer, Exhibit D.  By legal definition extant at the time, petitioner's trial counsel could and would not have urged that a killing while voluntarily intoxicated could be viewed as voluntary manslaughter, and hence, counsel could not be ineffective for not so arguing (even if counsel might be found effective in arguing for a greater offense – voluntary manslaughter – in lieu of the lesser – involuntary manslaughter).

It is difficult to see how petitioner's attempt to expand the claim to include voluntary manslaughter aids his case or makes a difference.  However, to the extent that petitioner sees something that the undersigned does not, the expansion is unexhausted, and in any event, counsel could not have been found ineffective for not arguing a legal theory not recognized at the time.  The case will be decided on the issues found appropriate in the Issues section, i.e., was counsel ineffective for not investigating and presenting evidence of voluntary

1  intoxication so as to reduce any crime, by whatever means available, to involuntary

2  manslaughter.  The court now turns to those issues.

3  VI.  Discussion

4           A.  Standards for Ineffective Assistance of Counsel

5           The test for demonstrating ineffective assistance of counsel is set forth in

6  Strickland v. Washington, 466 U.S. 668, 104 S. Ct. 2052 (1984).  First, a petitioner must show

7  that, considering all the circumstances, counsel's performance fell below an objective standard of

8  reasonableness.  Strickland, 466 U.S. at 688, 104 S. Ct. at 2065.  To this end, the petitioner must

9  identify the acts or omissions that are alleged not to have been the result of reasonable

10 professional judgment.  Id. at 690, 104 S. Ct. at 2066.  The federal court must then determine

11 whether in light of all the circumstances, the identified acts or omissions were outside the wide

12 range of professional competent assistance.  Id., 104 S. Ct. at 2066.  "We strongly presume that

13 counsel's conduct was within the wide range of reasonable assistance, and that he exercised

14 acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

15 695, 702 (9th Cir. 1990) (citing Strickland at 466 U.S. at 689, 104 S. Ct. at 2065).

16          Second, a petitioner must affirmatively prove prejudice.  Strickland, 466 U.S. at

17 693, 104 S. Ct. at 2067.  Prejudice is found where "there is a reasonable probability that, but for

18 counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at

19 694, 104 S. Ct. at 2068.  A reasonable probability is "a probability sufficient to undermine

20 confidence in the outcome."  Id., 104 S. Ct. at 2068.

21          In extraordinary cases, ineffective assistance of counsel claims are evaluated

22 based on a fundamental fairness standard.  Williams v. Taylor , 529 U.S. 362, 391-93, 120 S. Ct.

23 1495, 1512-13 (2000), (citing Lockhart v. Fretwell, 113 S. Ct. 838, 506 U.S. 364 (1993)).

24          The Supreme Court has recently emphasized the importance of giving deference

25 to trial counsel's decisions, especially in the AEDPA context:

26 \\\\\

In Strickland we said that "[j]udicial scrutiny of a counsel's performance must be highly deferential" and that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." 466 U.S., at 689, 104 S.Ct. 2052.  Thus, even when a court is presented with an ineffective-assistance claim not subject to § 2254(d)(1) deference, a [petitioner] must overcome the "presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'"  Ibid. (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).

For [petitioner] to succeed, however, he must do more than show that he would have satisfied Strickland's test if his claim were being analyzed in the first instance, because under § 2254(d)(1), it is not enough to convince a federal habeas court that, in its independent judgment, the state-court decision applied Strickland incorrectly.  See Williams, supra, at 411, 65 S. Ct. 363.  Rather, he must show that the [ ]Court of Appeals applied Strickland to the facts of his case in an objectively unreasonable manner.

Bell v. Cone, 535 U.S. 685, 698-699, 122 S. Ct. 1843,1852 (2002).

B.  Analysis

To succeed on this claim, petitioner must demonstrate that counsel acted unreasonably in failing to pursue the unconsciousness defense and that there is a reasonable probability that the outcome of petitioner's trial would have been different had this defense been presented.

Under California law when a person renders himself unconscious through voluntary intoxication and kills in that state, the killing is attributed to his negligence and is treated as involuntary manslaughter.  People v. Ochoa, 19 Cal.4th at p. 423, 79 Cal.Rptr.2d 408. Unconsciousness for this purpose need not mean that the actor lies still and unresponsive.  Id. at 423-424, 79 Cal. Rptr.2d 408.  Instead, a person is deemed "unconscious" if he committed the act without being conscious thereof.  Id.

See also CALJIC 8.47 "If you find that a defendant, *while unconscious as a result of voluntary intoxication*...When a person voluntarily induces his own intoxication *to the point of unconsciousness*..." (emphasis added).  While unconsciousness does not require the

11

1   incapacity to move or act, the given definition is somewhat of a tautology; but other cases and

2   authority define the level of lack of consciousness – and the level is very difficult to reach.  One

3   court has held that the level is that of an automaton.  People v. Webber, 228 Cal. App. 3d 1146,

4   1163 (1991).[2]  In other cases, courts found insufficient evidence to support a sua sponte

5   intoxication jury instruction when (1) the defendant had drunk some beer and whiskey and was "

6   'pretty well plastered' " People v. Spencer , 60 Cal.2d 64, 88, 31 Cal.Rptr. 782 (1963); (2) the

7   defendant had been drinking for several hours, but was "only woozy and not completely 'blacked

8   out'" People v. Simpson  192 Cal.App.3d 1360, 1370, 237 Cal.Rptr. 910) (1987); (3) the

9   defendant had been drinking before the crime; he appeared to be "'a little high'" at the time of

10  the crime, and he testified he was "'pretty drunk'" (People v. Cram (1970) 12 Cal.App.3d 37, 42,

11  90 Cal.Rptr. 393 (1970)); and (4) the defendant had drunk a dozen beers and some wine and

12  thought he was drunk, but knew what he was doing.  (People v. Gonzales (1970) 4 Cal.App.3d

13  593, 607, 84 Cal.Rptr. 863 (1970)).

14          The issue of how unconscious is unconscious is a critical one to the outcome here.

15  If it means simply that one's judgment has been "impaired" by alcohol or drugs, or even

16  "significantly impaired," nine out of ten murderers are not murderers, and petitioner is one of the

17  nine.  If, however, unconscious means that one has essentially lost the ability to think through

18  any act, see footnote 2 below, a much fewer number of life takers are absolved of murder, and it

19  shall be seen whether petitioner is counted therein.

20          The court finds that impairment in thinking per se does not satisfy the standards of

21  unconsciousness as that term is utilized in California law.  Based on the above law, any

22  impairment in thinking, or making judgments, or being able to intend an act, must be so severe as

23  to render a person in the circumstances at issue unable to exhibit any significant ability in those

24  _____

25  [2] "Automaton" is defined in this context as "a person or animal acting in an automatic or mechanical way."  Webster's New World Dictionary, Third College Edition at 93.  "Automatic"

26  in its pertinent meaning is defined: "done without conscious thought or volition, as if mechanically, or from force of habit."  Id.

12

1   areas.  An "unconscious" person might have the ability to simply respond, more or less

2   automatically, to stimuli, but from a cognitive standpoint, he does not have the ability to

3   purposefully influence his own response.

4          One more introductory note should be made.  For whatever reason, respondent

5   chose not to present an expert on petitioner's state of intoxication, i.e, the diminishment of

6   petitioner's ability to cogitate.  Therefore, in matters of medical expertise, unless findings are

7   made that petitioner's expert is not credible for reasons of testimonial method or for reasons

8   extant in the record, the expert's testimony will be the factual finding of the court.[3]

9                    Factual Background

10                *Petitioner's Trial Testimony*

11          At trial petitioner testified regarding the night of the murder.  He testified that at

12   around midnight, he, Kassy Goold and Steven Faddis ended up in the living room of his house.

13   RT at 647.  Petitioner was sitting in his chair in the corner and Goold was on the couch.  RT at

14   647.  Faddis was dancing to some music.  RT at 647.  Petitioner and Faddis were discussing a

15   trip to Mexico.  RT at 648.  Goold and Faddis left for awhile.  RT at 648.  When they returned,

16   petitioner was sitting in his recliner, Goold was on the couch and Faddis was dancing again.  RT

17   at 648-649.  Faddis then went outside.  RT at 649.

18          After Faddis went outside, Goold and petitioner began discussing the break-up

19   between Goold and Faddis.  RT at 649.  Petitioner then heard a crash and Faddis came into the

20   house.  RT at 649.  Faddis leaned over the coffee table, stuck his finger in Goold's face and

21   shoved her backwards.  RT at 651.  Faddis said to Goold, "I'm gonna kill your fuckin' brother."

22   RT at 651.  Faddis then grabbed Goold by the back of her head, lifted her off the floor and

23

24          [3]  A wise judge once told the undersigned: "Whatever actually happened out there – only
    God knows that.  What we do is attempt to determine what happened out there from what is
25   presented *in court*."  Therefore, unless the cross-examination of the only expert reveals that the
    expert essentially knows nothing on which he speaks, a difficult task, the court presumes that the
26   party opposing the expert cannot effectively oppose the expert.

1   slammed her through the coffee table.  RT at 651.  Petitioner got up and tried to help Goold out

2   of the coffee table.  RT at 651.  Petitioner asked Faddis, "What are you doin'?"  RT at 652.

3   Petitioner recalled that when he got between Faddis and Goold to help her up,

4   Faddis hit him in the head.  RT at 652.  Faddis then went outside.  RT at 653.  Petitioner got his

5   rifle, grabbed a drawer out the gun rack, set it down on the counter and took some shells out of it.

6   RT at 654.  Petitioner then loaded the gun as he headed for the door.  RT at 654.  At this time, he

7   thought that Goold was outside.  RT at 653.

8   When petitioner got outside, he saw Faddis behind one of the cars.  RT at 654.

9   Petitioner saw something under the rear of his pickup and thought it was probably Goold.  RT at

10  654.  Petitioner told Faddis to get off his property.  RT at 655.  Faddis responded by saying "fuck

11  you" twice.  RT at 655.  Faddis then began to come toward petitioner.  RT at 655.  Petitioner

12  fired a shot at his shoulder.  RT at 655.  Faddis continued to come toward him.  RT at 655.

13  Faddis also said to petitioner, "Fuck you, I'm gonna kill you."  RT at 657.  Petitioner shot Faddis

14  again in an attempt to disable him.  RT at 657.  Faddis then fell down.  RT at 658.

15  Petitioner then went into his house and called 911.  RT at 658.  After calling 911,

16  petitioner went outside and performed CPR on Faddis.  RT at 659.

17  *Evidentiary Hearing: Dr. Sokolov*

18  At the evidentiary hearing, petitioner called Dr. Gregory Sokolov as a witness.

19  The court certified Dr. Sokolov to testify as an expert.  Nov. 8, 2004, Evid. Hearing Transcript, p.

20  15.  Dr. Sokolov testified that at the time of the shooting, petitioner's blood alcohol level was

21  between .33 and .34.  Id. at 31.

22  Dr. Sokolov testified that alcohol effects the body both physically and mentally.

23  Id. at 17.  Someone with a blood alcohol level of .30 would have a fairly significant level of

24  intoxication.  Id. at 20.  At .30, an average person would have diminished reflexes and semi-

25  consciousness.  Id. at 20.  Semi-consciousness would be someone who is going back and forth

26  between alert to being highly stuporous, unawakeable.  Id. at 21.  It is a state that is bordering on

14

1   being in a coma.  Id.

2          At .30 to .35, it is physiologically possible for a person to be walking, talking and

3   moving, and yet be cognitively significantly impaired.  Id. at 21.

4          Dr. Sokolov testified that a person in an alcoholic blackout can be walking and

5   talking, but are not forming a memory of the event.  Id. at 23.  Sometimes a person in an

6   alcoholic blackout may have patches of memory.  Id. at 23.

7          The ability of a person with a blood alcohol level of .30 to .35 to perceive data,

8   reason, understand cause and effect, anticipate the consequences of their actions and to formulate

9   a plan is significantly affected.  Id. at 24.

10          There is not always a direct correlation between the degree of physical impairment

11   and the degree of mental impairment.  Id. at 26.  For example, learned behaviors may be less

12   impaired because they are stored in the long term memory.  Id. at pp. 26-27. For example,

13   someone with an extremely high blood alcohol level could tie their own shoes because this is a

14   learned behavior.  Id. at 27.  If someone were a hunter or a target shooter, they may be able to

15   load a gun even though they were extremely intoxicated if this were a learned behavior over

16   many years.  Id. at 27.

17          Tolerance to alcohol, derived through continuous excessive drinking, might well

18   reduce the physical manifestations of intoxication, but it was unclear whether cognitive abilities

19   could also be less impaired on account of alcohol tolerance.  Id. at 29-31.

20          Dr. Sokolov testified that on the night of the incident, petitioner was suffering

21   from extreme alcohol intoxication based on his blood alcohol level.  Id. at 32.  The fact that

22   petitioner was observed by a sheriff on the scene on the night of the incident walking and

23   performing other functions does not indicate that petitioner's mental functions were intact.  Id. at

24   33.  With a blood alcohol level of .33 to .34, there would be impairment in both auditory and

25   visual processing.  Id. at 33.  Petitioner's ability to logically reason, weigh choices and anticipate

26   consequences would have been significantly impaired.  Id. at 34-35.

1      Dr. Sokolov testified that petitioner's level of impairment was somewhere

2 between full, i.e. a coma state, and sober.  Id. at 36.  He could not put a numerical value on it.  Id.

3 at 36.  Petitioner's cognitive and perceptual functions, i.e. his ability to perceive the level of

4 danger to his and Goold's life, were impaired by alcohol.  Id. at 36-37.  As a result of alcohol, at

5 the time of the shooting petitioner was unable to cognitively process that a shot at the chest could

6 be lethal.  Id. at 37.  Petitioner's ability to appreciate the cause and effect relationship was

7 significantly impaired by alcohol at the time of the shooting.  Id. at 38.

8      After reviewing the evidence in petitioner's case, including the trial testimony, Dr.

9 Sokolov opined that at the time of the killing, petitioner's ability to form an intent to kill was

10 impaired.  Id. at 39.  Dr. Sokolov [inconsistently] testified that, based on his impaired executive

11 functioning, petitioner's statement after the shooting that even though he pointed the gun at

12 Faddis he did not mean to kill him was credible.  Id. at 40.

13      Dr. Sokolov testified that as a result of alcohol petitioner's ability to perceive the

14 seriousness of the threat posed by Faddis was significantly impaired.  Id. at 45-46.  Petitioner's

15 high blood alcohol level made his claim that he was acting to defend himself and Goold more

16 likely to be true.  Id. at 47.

17      Had Dr. Sokolov been contacted by trial counsel prior to trial and reviewed the

18 record, he would have concluded that petitioner acted without intending to kill Faddis and that

19 petitioner acted without realizing that his actions could have killed Faddis.  Id. at 47-48.

20      Petitioner's statement that he attempted to only harm Faddis when he first shot

21 him indicated that there was some ability to plan, but this was affected by his impairment.  Id. at

22 50.  Petitioner's warning to Faddis to stop coming toward him also indicated some cognitive

23 functioning, but it was still alcohol impaired.  Id. at 67.

24      Significantly, as seen above and more fully explicated below, *the expert could not*

25 *precisely pin down where petitioner stood on the impairment spectrum.*

26 \\\\\

1       The Court: One fact that bothered me in the case....Mr. Miller
testified that he first attempted to wound the victim.  In other
2       words, he made that mental determination, if I shoot at the
shoulder, I will stop him.  Doesn't that level of functioning indicate
3       that he is not all that mentally impaired?  He is able to make a
determination, If I shoot there, [I] might be able to just wound him
4       and things will be all right.

5       The Witness: Well, I think that statement alone doesn't imply that
he was cognitively with it, but I mean, what it implies is that he
6       wanted to stop him, so what level of thought he had put into, you
know, how successful he was going to be in stopping him is hard
7       to say, but he did say that his initial thought or reaction before
shooting him was to stop him.  That is what I found in the record.
8

9       The Court: Without going into... we are talking about cause and
effect.  He is able to make that determination, if that testimony is
10      true, if I shoot him there, I will just wound him, and there was
cause and effect...but he is going through this in his own mind.

11      The Witness:  Right.  That does indicate that there was some
ability to plan, but was it intact or was it without impairment?  I
12      don't think you can interpret that from that statement alone.

13      The Court: What about his determination to do CPR immediately
after the victim is down?  That seems unlikely that someone who is
14      near coma, if you will, would be thinking about that or be able to
do it because it requires some steps to do it?
15

16      The Witness: Well, first of all, I don't think that Mr. Miller was,
based on the reports and observations, near coma stage.  I think
17      that what I said earlier is that his levels were approaching those
seen in people with comas, but I am not implying that he was
18      approaching coma.  What I was implying more was that he was
reaching a significant level of impairment, that in some people can
19      cause coma and respiratory depression.  The ability to perform
CPR, again, could be a learned memory that he had had, that he
20  RT.  had done CPR before...

                                  \***
21      The Witness: Well, again, automaton is a legal term.  I wouldn't
know what a clinical correlative of that would be.  I certainly don't
22      believe he was a robot or robotic like, but again, does that imply he
had good intact cognitive functioning, no.
23  RT 68.

                                  \***
24      Mr. Zall: How about the fact that Mr. Miller seemed to be able to
understand the officers that arrived on the scene in terms of their
25      instructions and things like that?  Would that tend to be consistent
or inconsistent with someone in a stuporous state?
26

A. In a stuporous state, no.  I mean it's how  we define
stupor....Stuporous, to me, is somebody who goes from periods of
looking sedated or overly sedated, being oriented and then at times
not being oriented, It's not all or nothing, like a coma or fully
conscious state, so there is a degree of impairment.  I would not
define it as a coma or even a semi-coma.  It would be more that
somebody is – somebody who's arousable, but yet sedated.

RT 71-72

***

The Witness: It [determining to get the rifle and correct
ammunition to deal with a situation] shows some cognitive
functioning.  Does it show fully intact cognitive functioning or
reasoning, no.

RT 76

There are other examples from the testimony, both on direct and cross-examination.  Although the witness testified consistently that petitioner was impaired, even significantly impaired in his mental functions, without "fully intact" or "good" cognition, petitioner was not characterized as acting unconsciously, i.e., completely without volitional thought, robotic like, or in a semi-coma or stuporous; he demonstrated "some" cognitive abilities.

*Evidentiary Hearing: Mark Cibula and Ronald McIver*

Two lawyers represented petitioner during his trial, Mark Cibula and Ronald McIver.  At the time of petitioner's trial, Cibula had been a lawyer for approximately two years.  Id. at 86.  Cibula had not handled a homicide trial prior to petitioner's case.  Id. at 88.  Cibula decided to associate McIver as co-counsel because of his inexperience.  Id. at 89-90.

From the beginning, petitioner informed his lawyers that he wanted his defense to be self-defense.  Id. at 101.  Petitioner was emphatic that he did not intend to kill Faddis.  Id. at 102.

Cibula and McIver hired one expert for trial, Dr. Sharon Van Meter.  Id. at 112.  Her testimony concerned the trajectory of the bullet and whether it was possible to extrapolate from that the positions of Faddis and petitioner at the time of the shooting.  Id. at 116.  Cibula and McIver consulted with a psychologist, Dr. Marilyn Wooley, prior to trial.  Id. at 118.  Dr.

18

1    Wooley advertised her services as a forensic psychologist.  Id. at 120.  After the meeting. Dr.

2    Wooley informed Cibula and McIver that she did not see any issues which she thought they

3    should present through her.  Id. at 121.  Cibula had no direct memory of discussing the issue of

4    petitioner's intoxication with Wooley, but he remembered that this was one of the primary

5    reasons for contacting her.  Id. at 122.

6           Cibula was concerned that he had an "inconsistency problem" were he to present

7    intoxication evidence.  Cibula thought it would be difficult to argue to the jury that petitioner was

8    so drunk he had no idea what he was doing and, at the same time, ask the jury to believe

9    petitioner's testimony regarding what occurred.  Id. at 124-125.

10          Cibula did not think that arguing self-defense was a problem because the

11   petitioner presented the facts to him suggested that he was not too drunk to perceive what was

12   going on.  Id. at 127.

13          My thought process was, what was the stronger argument, and
14          what is it in conjunction with?  Also, of course, with Mr. Miller in
             regards to how and what issue we were going to present.

15          I agree with Ms. Claire's comment that if you think your client is
             all wrong, you have a duty certainly to sit back and have those
16          discussions, and you know, may be change things; but certainly
             Mr. Miller, at the time, presented to me that this would have been
17          much less than a victory, in fact, a failure, had it been something
             other than a perfect self-defense.
18
             He had rejected a lesser included.  I think it was a voluntary was
19          the offer.  I can't recall specifically.  He rejected a lesser offer.  He
             wanted a perfect self-defense.  There was plenty of facts there to
20          present to the jury for a perfect self-defense, and that was a
             stronger argument than going in and making the argument that now
21          instead he was just too drunk.

22          And in addition, Mr. Miller wished to testify, and as I stated
             earlier, I think he had a very clear, concise view of what occurred.
23          I don't want to say perfectly concise, but then to argue at the same
             time, that no, he was just absolutely too drunk to understand
24          things, would not have been a very good defense to be presenting,
             these two conflicting arguments.
25

26   Id. at 147-148.

                                              19

McIver testified that he and Cibula wanted to meet with Dr. Wooley to brief her on the case and discuss with her whether she thought she could be of any assistance in the area of voluntary intoxication.  Nov. 23, 2004, Evidentiary Hearing Transcript, p. 187.  McIver could not recall any questions he asked Dr. Wooley during the meeting.  Id. at 188.  He recalled that she told them that she did not believe she could be of any assistance.  Id. at 188.

*Dr. Wooley*

On November 5, 2004, the parties filed the declaration of Dr. Wooley.  Dr. Wooley has no specific recollection of a meeting with McIver and Cibula regarding petitioner's case.  Wooley declaration, ¶ 2.

> 3.  I have been unable to locate any files or materials related to Mr. Miller's case.  If I was not retained to evaluate Mr. Miller, I would not have opened a filed or maintained any records.
>
> 4.  I do not recall what mental state issues or potential defenses counsel asked me about, or what mental state issues or potential defenses we discussed, if any.
>
> 5.  I have a general psychotherapy practice, and offer general forensic consulting and evaluation services.  My forensic expertise includes the areas of child sexual and physical abuse, spousal abuse, and child custody.  My clinical practice specializes in these areas, as well as eating disorders and trauma-related stress management.
>
> 6.  All licensed clinical psychologists have been trained in the identification and treatment of alcoholism and substance abuse, among many other areas of general practice.  However, I was not a substance abuse specialist at the time of the meeting.  As among clinical psychologists and comparable mental health professionals, I was not at the time an expert in the particular effects of alcohol on the brain and its functioning.

Wooley declaration, ¶¶ 3-6.

2.  Application

All would agree that petitioner was intoxicated at a level, which in a normal, non-tolerant person would approach "lights out."  That is what is so puzzling about this case because petitioner acted far from such a state, not only in one or two areas, but in many.  *Taken together*

1    one can certainly conclude that petitioner was impaired in his cognitive abilities, but was not

2    "unconscious" as the law requires.  Therefore, petitioner's counsel can not be faulted for not

3    presenting a voluntary intoxication theory, nor can the court find prejudice from their decision

4    not to raise such.

5              After the provocation with Faddis' girlfriend ensued, and after Faddis had left the

6    apartment, petitioner was able to :

7              1- determine to get and find a weapon which was not on his person;

8              2- acquire the correct ammunition and load the firearm;

9              3- form the clear intent to initially wound rather than kill;

10             4- act upon that intent by aiming the weapon away from vital organs;

11             5- warn the victim not to come closer before he fired the fatal shot;

12             6- call to get help immediately after the shooting;

13             7- administer CPR because of his understanding of the victim's status;

14             8- communicate coherently with the police when they arrived on the scene;

15             9- give a detailed, organized account from memory of what had

16             transpired (the antithesis of even a patchy memory much less a

17             memory totally obliterated by alcohol).

18             Even when asked to focus on the totality of petitioner's activities, petitioner's

19   expert would always focus upon one, and conclude that it was possible that petitioner could have

20   performed a singular activity by rote memory without thinking.  See RT 72.  However, the

21   expert shied away from taking all of these actions together to form the total picture of petitioner's

22   mental status on that night.  The total picture simply does not permit a finding of legal

23   unconsciousness.

24             Accepting the expert's medical opinions as the undersigned must in the absence of

25   opposing expert testimony, that petitioner was not completely "with it" from a cognitive

26   standpoint, or that petitioner was "impaired" in his judgment, the undersigned rejects the legal

1  conclusion that petitioner was so impaired in his thinking that he did not know what he was

2  doing on the murder night as would render him legally unconscious.

3          Moreover, petitioner's trial counsel were faced with the fact that when taken

4  together, the totality of activities *which petitioner clearly recollected* would make it very difficult

5  to convince a jury that petitioner was legally unconscious when he fired the fatal shot.  While a

6  self-defense theory was also problematic given that the victim had left the apartment and

7  petitioner went out with a rifle afterwards, this was the defense that *petitioner* was mandating.  In

8  addition, counsel had at least explored the possibility of presenting an intoxication theory to the

9  jury by visiting a mental status expert.  While not a forensic alcohol expert herself, this person

10  certainly knew enough about alcohol impairment to direct counsel to other witnesses if she

11  thought the facts required. Choosing one of two problematic defenses, and the one which the

12  client desired, is not an unusual situation for attorneys in the defense business.  Bad facts are bad

13  facts, and counsel have to make decisions about how to account for those bad facts.  Counsel

14  were not unreasonable, and were certainly not <u>Strickland</u> deficient simply because a good theory

15  was not available.

16          Importantly, as detailed above, *even the expert could not place petitioner on any*

17  *particular point on the scale of intoxication*.  An expert's saying that someone is in between a

18  coma state and sober, RT 36, and that the expert could not put a numerical value on it, does not

19  indicate that counsel should themselves have placed petitioner on the outer end of the scale – at a

20  point of unconsciousness.

21          In this case, the two distinct <u>Strickland</u> prongs merge in that the reasonableness of

22  counsel's actions depended on the viability of the intoxication/unconsicousness theory.  The

23  more likely it was that petitioner was legally unconsciousness, the more prejudicial it would have

24  been not to override petitioner's defense desires and hence more unreasonable not to pursue such

25  a theory – and vice versa.  Having found that counsel were reasonable in not pursuing the

26  problematic intoxication/unconsciousness theory, it follows that prejudice has not been

1   established either.

2        IT IS HEREBY RECOMMENDED that petitioner's ineffective assistance of

3   counsel claim be denied and judgment be entered.

4        These findings and recommendations are submitted to the United States District

5   Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty

6   days after being served with these findings and recommendations, any party may file written

7   objections with the court and serve a copy on all parties.  Such a document should be captioned

8   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

9   shall be served and filed within ten days after service of the objections.  The parties are advised

10  that failure to file objections within the specified time may waive the right to appeal the District

11  Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

12  DATED: 11/2/06

13                              /s/ Gregory G. Hollows

14                              _____
                                GREGORY G. HOLLOWS
15                              UNITED STATES MAGISTRATE JUDGE

16  mill757.157

17

18

19

20

21

22

23

24

25

26